**Raul MASCARENHAS,**
**Plaintiff-Appellant,**

v.

**MERIDIAN HOSPITAL AUTHORITY et al., Defendants-Appellees.**

No. 75–2682.

United States Court of Appeals,
Fifth Circuit.

Oct. 11, 1977.

Rehearing Denied Nov. 7, 1977.

Wm. F. Kemp, Austin, Tex., for plaintiff-appellant.

W. V. Dunnam, Jr., Waco, Tex., for defendants-appellees.

Jack D. Welch, Marlin, Tex., for Hilderbrand, et al.

Before TUTTLE, GOLDBERG and CLARK, Circuit Judges.

GOLDBERG, Circuit Judge:

The Meridian Hospital Authority contracted to sell its hospital to Dr. Raul Mascarenhas. He now challenges the Authority's refusal to comply with its bargain. Although ever hesitant to release a party from a negotiated bargain entered in good faith, we conclude that the Authority lacked statutory authorization to sell its hospital and that the contract therefore is unenforceable.

## I.

Meridian is a small town approximately 70 miles south of Fort Worth, Texas. In the late 1960s the city decided to build a new hospital. Pursuant to Tex.Rev.Civ. Stat. art. 4437e, the City Council passed a resolution creating the Meridian Hospital Authority. In 1968 the Authority secured federal financing in exchange for revenue bonds, and in January 1970 the new hospital opened its doors.[1]

The hospital immediately encountered financial difficulties. One of the town's two doctors died, and the other had too few patients to support the 32-bed facility. Behind on its bond payments and losing money, the Authority began a search for a new doctor.

In 1971 Dr. Mascarenhas, who practiced in Burleson, 14 miles south of Fort Worth, passed through Meridian and visited the hospital. The chairman and other members of the Authority's Board of Directors approached Mascarenhas concerning moving his practice to Meridian. In ensuing negotiations, Mascarenhas and another Fort Worth physician, Dr. Herman Burgos, indicated an interest in moving to Meridian under an acceptable arrangement.

On July 12, 1971, Mascarenhas and Burgos executed a contract with the Authority. The doctors agreed to move their practices to Meridian and to maintain 24-hour coverage there for one year beginning immediately. In return, the Authority granted the doctors an option to purchase the hospital after two years. The purchase price apparently was to be the amount of outstanding indebtedness, $660,000. Each doctor would lose his option if "proven guilty" of "gross negligence."

The doctors initiated the promised coverage and used the hospital for their Fort Worth patients as well. The hospital began operating at near capacity levels, and its financial picture improved dramatically. The hospital became current on its bond payments.[2]

As the time approached when the doctors would be able to exercise their option to purchase the hospital, however, controversy over that possibility grew. On July 10, 1973, the Authority's Board of Directors voted 4–3 not to honor the contract. Although the Authority now contends that the reasons for that decision included the doctors' failure to provide 24-hour coverage at the hospital and their gross negligence, the district court found that the decision resulted primarily from a change in the membership of the Board.

From at least July 10 forward, relations between the Authority and the doctors were strained. At an August 14 Board meeting, the Directors cancelled the staff privileges of Dr. Mascarenhas and Dr. Burgos, effective immediately. Later in August the doctors filed suit in federal court[3] challenging the staff privilege revocation and the refusal to sell the hospital. On September 4, 1973, the Authority notified the doctors that their staff privileges were being reinstated pending a hearing before the Board. The Authority gave the doctors notice of the alleged reasons for the termination, listing their negligence, professional incompetence and failure to be available for reasonably expected medical necessities. At the September 14 hearing, which generated enough public interest to require its removal from the hospital to the local courthouse, the Board heard testimony and decided to reinstate the doctors but to limit their surgical privileges. The doctors, who were general practitioners, were not to perform any operations without the assistance of a surgeon.

1. A geriatric center adjoined the 32-bed hospital. In all the relevant transactions the principals treated the two facilities as a unit, and we refer to both when we speak of the "hospital".

2. The hospital received a testamentary grant at about that time, helping eliminate its deficit. Irrespective of this bequest, however, operating income was significantly higher under the new arrangement.

3. The doctors, citizens of foreign countries, invoked the court's diversity jurisdiction, 28 U.S.C. § 1332.

The scene of battle then shifted once again to the federal courthouse. The district court tried the action without a jury. After the doctors presented their case in chief, Dr. Burgos settled his claim. Dr. Mascarenhas continued, though, and the district court held that the three-week suspension of the doctor's staff privileges was a violation of the contract, for which it awarded $8,400 damages. The court also determined, however, that the contract's provision for sale of the hospital was unenforceable because inconsistent with the Texas Constitution's proscription of any "grant" of public property, Tex.Const. art. 3 § 52,[4] and because violative of the Hospital Authority Act's provision that such hospitals must be operated "without the intervention of private profit," Tex.Rev.Civ.Stat. art. 4437e § 14.

Dr. Mascarenhas appeals; the Authority does not. Thus the only issues before us are those relating to the sale. Although reaching our conclusion by a somewhat different route than the district court, we agree that the provision for sale of the hospital is unenforceable, and we therefore affirm.

## II.

The City of Meridian created the Meridian Hospital Authority pursuant to the "Hospital Authority Act," Tex.Rev.Civ.Stat. art. 4437e, § 1 et seq. That Act provides that the Authority is a "body politic and corporate," art. 4437e § 3, with the "power to construct, enlarge, furnish and equip Hospitals, purchase existing Hospitals, furnishings and equipment for its Hospitals, and to operate and maintain Hospitals." art. 4437e § 6. The dispositive issue in this case is whether the Authority also possessed the power to sell its hospital.[5]

In Texas an entity such as this Authority "may exercise only such powers as have been expressly delegated to it by the Legislature, or which exist by clear and unquestioned implication." *Tri-City Fresh Water Supply District No. 2 v. Mann*, 135 Tex. 280, 282, 142 S.W.2d 945, 946 (1940).[6] Although in the intervening decades the *Tri-City* formulation may have come in for minor adjustments, no major overhaul has become necessary. Our greater familiarity with proliferating public bodies might lead us to state with greater liberality the extent to which powers not expressed in the statute can be found by implication, but the overriding command of *Tri-City* remains intact. Our focus must be the statute which authorized the creation of the governmental entity. *Id.*, 135 Tex. at 281, 142 S.W.2d at 946.

Here the relevant statute authorized the purchase, construction and operation of hospitals but did not expressly approve their sale. The mandate to operate the hospital should undoubtedly receive a broad reading that would validate any acts an Authority might undertake to effectuate its views of how best to achieve the hospital's purposes. Even such a broad reading, however, provides no support for the Authority's attempted sale of its only hospital. Far from

4. The court reasoned that the value of the hospital ($2,000,000) exceeded the sales price ($660,000) and thus constituted, in part, a gift. Appellant notes before us that the $2,000,000 figure was an estimate of the hospital's *1973* (not 1971) value and that the consideration for the contract also included the doctors' agreement to move their practices to Meridian.

5. Because of our resolution of this issue, we need not reach the two grounds on which the district court reached its decision nor the Authority's alternative arguments that the contract executed by the Board president and acting secretary exceeded the authority the Board had granted them, that Mascarenhas forfeited his option because of "gross negligence" within

the relevant contractual provision, that the doctors failed to meet their contractual obligation to provide 24-hour coverage for one year, and that the condition precedent of federal approval of the sale had not been satisfied.

6. While *Tri-City* dealt with a Fresh Water Supply District, not a Hospital Authority, the principles are the same. The statute authorizing the governmental unit and the inferences derived from it provide the basis for determining the corporate powers. Whatever label should attach to Hospital Authorities for other purposes, in the context before us the question is whether the statutory scheme authorizes the challenged conduct.

an effort to operate a hospital, the sale was an attempt to exit the hospital business altogether.[7]

Nor can we say that, apart from the words of the statute, the Authority should possess the inherent ability to make the sale. As an initial matter, the notion is at least problematic that a body created by the city council to maintain a hospital for the city's residents should be able to decide on its own, without city council or popular approval, to terminate its existence and to sell its public property to private buyers. The potential for public loss or even abuse that such sales would present, coupled with the lack of any indication that sales authority would ordinarily prove necessary or helpful to the hospital's functioning, convinces us that we should find no such authority absent some manifestation of legislative approval. Had the legislature desired to authorize such transactions, it could have said as much.[8]

Our reading of the statute as it existed upon the contract's 1971 formation draws strength from related 1973 and 1975 enactments. In 1973 the legislature enacted Tex. Rev.Civ.Stat. art. 4437e–1, which empowers a Hospital Authority, "[i]n addition to any other powers which it may now or hereafter have," to lease its hospital. Tex.Rev.Civ. Stat. art. 4437e–1 § 1. This provision suggests that the legislature believed an Authority lacked leasing power under the original Act and supports the additional inference that such bodies were without the similar power of sale. More importantly, in 1975 the legislature enacted the "Hospital Project Financing Act," Tex.Rev.Civ.Stat. art. 4437e–2. Among the "hospital projects" covered by the new Act were those of art. 4437e Hospital Authorities. The new Act expressly grants an Authority the power "to sell such hospital project to any non-profit corporation . . . ." The clear mandate of that provision is that an Authority may not sell a hospital project to a for-profit buyer. Had the new Act been in effect at the relevant times, the sale of the Meridian Hospital would undeniably have been improper. As a continuation of the trend toward greater alienation rights begun in 1973, the 1975 Act indicates that in 1971 the Authority did not possess the ability to sell its hospital.

In summary, the generative legislation neither expressly nor implicitly approves an Authority's sale of its hospital. Unlike ordinary or even extraordinary activities undertaken by an Authority as part of its ongoing management of a hospital, a sale deviates from the statutory scheme so drastically as to require legislative support. In this statute there is no such support, and subsequent enactments make clear that none was intended. We must therefore reject the doctor's plea to hold the Authority to its bargain. The Act may have ambiguities, latent or patent, but one certainty emerges beyond cavil: the statute was not to be used as the instrumentality to subsidize a hospital operated by private interests for profit. This concept, embedded in a hospital's natality, is equally relevant to its demise. The district court's decision is

AFFIRMED.

---

7. Thus we do not have before us a sale of one hospital in connection with the purchase or construction of another. Such a situation would raise different considerations.

8. By this discussion we do not rule out the possibility of sale if truly necessary to prevent the hospital from closing. In the case at bar the district court found no such necessity, and the record does not indicate sufficient necessity to trigger whatever sales authority might exist.